FILED
2013 Sep-17  AM 10:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION**

| | | |
|---|---|---|
| **JOSEPH O'NEAL ENGLAND,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **6:12-CV-01093-KOB** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On August 17, 2009, the claimant, Joseph England, applied for disability insurance benefits under Title II and for supplemental security income under Title XVI of the Social Security Act. (R. 24). The claimant alleges disability commencing on October 30, 2008 because of chronic pain and injuries to his back, feet, and shoulder. The Commissioner denied the claim both initially and on reconsideration. The claimant filed a timely request for a hearing before an Administrative Law Judge (ALJ), and the ALJ held a hearing on March 13, 2011. (R. 24, 27). In a decision dated August 5, 2011, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and thus was ineligible for disability insurance benefits or supplemental security income. (R. 33). On November 23, 2011, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Social Security Administration. (R. 7). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated

below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review:

(1) whether the ALJ properly applied the Eleventh Circuit's pain standard;

(2) whether the ALJ gave proper weight to the medical opinion of record from Dr. Raj Sehgal,

his treating physician; and

(3) whether the ALJ gave proper weight to the consultative evaluation report of Dr. Bharat

Vakheria, the ALJ's expert.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must

affirm the Commissioner's decision if the Commissioner applied the correct legal standards and

if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham*

*v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.

1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims." *Walker*, 826

F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The

court will affirm those factual determinations that are supported by substantial evidence.

"Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402

U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the

[Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently employed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, supbt. P, app. I?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be

expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1225-26 (11th Cir. 2002); 20 C.F.R. § 404.1529. The law does not require that an ALJ specifically "cite or refer to the language" of the test, as long as her "findings and discussion indicate that the standard was applied." *Wilson v. Barnhart*, 284 F.3d 1219, 1225-26 (11th Cir. 2002). "In determining whether the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain, the fact-finder must also consider the credibility of claimant's testimony." *Lamb v. Bowen*, 847 F.2d 698, 702 (11th Cir. 1988).

Furthermore, the law in this circuit is well established that the Commissioner must give the opinions of the treating physician substantial or considerable weight. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988). Absent a showing of *good cause* to the contrary, the commissioner cannot discount the treating physician's opinions. *Id.* "Good cause" is a fairly broad standard and the Eleventh Circuit has recognized its existence in at least three sets of circumstances. The first circumstances exists where no objective medical evidence accompanies the opinion of the treating physician, the opinion is wholly conclusory, or it is contradicted by the physician's own treatment notes. *Edward v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *see also Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).

The second circumstance exists where the "treating physician's opinion was not bolstered by the evidence." *Phillips,* 357 F.3d at 1241. Finally, the ALJ can find good cause to discount the treating source opinion where the "evidence supported a contrary finding" from that of the treating source. *Id.*; *see also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987) ("ALJ may reject any medical opinion if the

evidence supports a contrary finding"); *Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984).

However, where medical evidence does not conclusively counter the treating physician's opinion, and no other good cause is presented, the Commissioner cannot discount the treating doctor's opinion. *Schnorr v. Bowen*, 816 F.2d 578 (11th Cir. 1986). If the ALJ decides to discount the opinion of the treating physician, he must "clearly articulate" his reasons for doing so. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004).

The ALJ has no obligation to give controlling or great weight to the opinion of an examining physician, which includes any physician that is not a treating physician. *See Hankins v. Astrue*, No. 4:11-cv-2426-RDP, 2012 WL 4479242, at *8 (N.D. Ala. September 24, 2012) (citing *Russell v. Astrue*, 331 F. Appx. 678, 681-82 (11th Cir. 2009)). In either case, however, the ALJ must clearly articulate the weight accorded to each item of evidence and the reason for the decision so that the reviewing court may determine whether the decision is based on substantial evidence. *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).

## V. FACTS

The claimant has a tenth grade education and was twenty-six years old at the time of the alleged disability onset date. (R. 31, 195). His past work experience includes work as an escort driver, a material handler, a wooden frame builder, a drywall applicator, and an electrician's helper. (R. 31). The claimant alleged he was unable to work because of pain in his lower back, feet, and shoulder. (R. 43).

### *Physical Limitations*

According to the claimants' reports to various doctors, in 2002 or 2003, he experienced a motor vehicle accident. (R. 233, 256). Claimant also reports that he underwent shoulder surgery,

although he does not provide any documentation for this procedure and none of the doctors'
reports before the court mention the time frame for the surgery. (R. 265, 268).

Claimant visited Dr. Raj Sehgal complaining of back pain and requesting medication on
October 9, 2008, November 6, 2008, December 11, 2008,  January 5, 2009, February 2, 2009
March 2, 2009, March 30, 2009, April 28, 2009, May 28, 2009, June 25, 2009, and July 23,
2009. (R. 244-54). At the February 2, 2009 visit, claimant also complained that his toes hurt. (R.
250). At the first two visits, claimant's medications included Xanax, Zestril, Lorcet, and
Tenormin. Beginning in December 2008, claimant no longer took Tenormin and took Zoloft. (R.
244-54).  On July 30, 2009 and September 9, 2009, claimant saw Dr. Todd Smith and
complained of pain in his lower back and left foot. Dr. Smith diagnosed claimant with left leg
radiculitis, spondylosis of the lumbar spine, and left foot hammer toes. He noted that claimant
did not want to incur the cost of treating his back, but did want something done for his foot. Dr.
Smith referred him to Dr. Eli Hurowitz. (R. 255-56).

Following an August 3, 2009 visit (R. 265), Dr. Eli Hurowitz performed outpatient
surgery to correct claimant's left second, third, fourth, and fifth claw toes on August 5, 2009. (R.
233). Dr. Hurowitz placed pins in these toes to correct their alignment. (R. 237). Claimant
reported to Dr. Hurowitz that the clawing and pain in his foot began after his 2003 car accident.
(R. 233). On August 20, 2009, claimant saw Dr. Sehgal, requesting pain medication for back pain
and reporting his August 5, 2009 foot surgery. (R. 243).

Claimant returned for follow up visits with Dr. Hurowitz on August 12, 2009, August 26,
2009, September 9, 2009 and October 6, 2009. ( R. 261-64). At the August 26, 2009 visit, Dr.
Hurowitz noted that "[claimant] talked about disability, but it's unlikely that he'll get much for 1

6

foot." (R. 263). At the final follow up in October, Dr. Hurowitz reported that claimant's toes "look[ed] good," prescribed the claimant more Percocet, and sent him back to Dr. Smith for his back pain. (R. 261).

Claimant reports on his September 17, 2009 Adult Function Report that his daily activities include showering; changing, feeding, bathing, and rocking his daughter; putting her down for naps; helping pick up dishes and dirty clothes; going to the store two to three times a week; watching television; playing video games; and resting. (R. 162, 165-67). Also on September 17, 2009, claimant saw Dr. Sehgal for back pain and medicine refills. (R. 320). Claimant continued to see Dr. Sehgal on October 15, 2009 and again on November 12, 2009, at which time claimant reported that he strained his back picking up a bedroom dresser. (R. 319-20). Dr. Sehgal also saw claimant on December 10, 2009. (R. 317).

Mrs. Leslie T. Jackson from the Disability Determination Service referred claimant to Dr. Bharat Vakheria, who performed a disability examination on claimant on December 10, 2009. Dr. Vakheria noted claimants complaints and diagnosed claimant with "(1) Moderate to Severe Low Back Pain with Radiculopathy," "(2) History suggestive of Degenerative Disc Disease," "(3) Left Foot Pain," "(4) Neuropathy of the Left Foot," "(5) Right Shoulder Pain," "(6) Hypertension," and "(7) History of Headache." (R. 267-69).

On January 6, 2010, claimant saw Dr. Hurowitz again, reporting that a horse stepped on his operative left foot on November 28, 2009. (R. 306). Dr. Hurowitz's report is the first mention of this equestrian accident, as it was not mentioned in the thorough report of Dr. Vakheria's examination, which occurred less than two weeks after the reported date of the accident. (R. 267-69). Claimant saw Dr. Sehgal on January 8, 2010 and March 5, 2010. (R. 315-16). The reports

from these visits show that claimant complained of back pain, but do not mention the equestrian accident. *Id*.

On March 12, 2010, claimant visited the Baptist Medical Center-Princeton Emergency Department complaining of back pain and was prescribed Northex. (R. 295-300). On March 15, 2010, claimant followed up with Dr. Hurowitz regarding the equestrian accident, and Dr. Hurowitz referred claimant to a pain doctor and sent him back to Dr. Smith for his back. (R. 305). Claimant saw Dr. Sehgal again on April 1, 2010, April 29, 2010, and May 27, 2010. (R. 312-14). At the April 29, 2010 visit, Dr. Sehgal reports that claimant had swelling in his left foot, but denied any injury to the foot or ankle. (R. 313).

At the May 27, 2010 visit, Dr. Sehgal filled out a Physical Capacities Evaluation for claimant. Dr. Sehgal opined that the reasonable lifting or carrying expectation for claimant was "10 pounds occasionally or less frequently," that claimant could sit and stand for a total of one hour each during an eight hour workday, and that claimant's chronic back and shoulder pain caused restrictions in his pushing, pulling, climbing, gross manipulation, bending, stooping, reaching, operating motor vehicles, and working with or around hazardous materials. Dr. Sehgal reported that claimant was not restricted in "fine manipulation (finger dexterity)." In Dr. Sehgal's Clinical Assessment of Pain, he marked that "[p]ain is present and found to be irretractble and incapacitating to this individual," that physical activity would cause an "[i]ncrease of pain to such an extent that bed rest and/or medication is necessary," and that "[p]atient will be totally restricted and thus unable to functions at a productive level of work." (R. 321-23).

On July 12, 2010, Dr. Sehgal issued a letter addressed "To Whom It May Concern," stating: "Mr. England takes daily medication for pain and nerves. It is ok for him to take his

medication and work." (R. 325). On June 24, 2010, Dr. Sehgal saw complainant for his back pain and reported that his pain had increased because he had been working on a horse pen. At this time, claimant's medications included Xanax, Tenormin, Lorcet, Halcion, Zoloft, and Oxycontin. (R. 326). Dr. Sehgal continued to see complainant for back pain on July 23, 2010, August 19, 2010, September 17, 2010, October 15, 2010, November 12, 2010, December 10, 2010, January 14, 2011, and February 11, 2011 ( R. 328-37).

At the October 15, 2010 appointment, claimant reported that three weeks previously he has fallen and broken his right ankle and leg. (R. 333). Although Dr. Sehgal's report does not mention the cause of this injury, it coincides in time with claimant's testimony about his fall off of a porch. (R. 42-43). Claimant continued on the same medication until November 12, 2010, when Dr. Sehgal took him off the Oxycontin and put him on Soma. (R. 334). On the February 11, 2011 report, Dr. Sehgal noted that claimant complained of back stiffness as a result of working to escort mobile homes to Louisiana. At this time, Dr. Sehgal took claimant off Lorcet and Zoloft and put him on Percocet. (R. 337).

The ALJ sent interrogatories to Dr. Sehgal on two different occasions, first on an unknown date and then again on June 20, 2011. (R. 338, 339-40, 343). The interrogatories asked how Dr. Sehgal determined his answers on the Physical Capacities Evaluation Form, and for explanations of the July 12, 2010 letter, the June 24, 2010 notation regarding claimant's work in a horse pen, and the February 11, 2011 note about claimant's work escorting mobile homes to Louisiana. (R. 338, 343). According to the ALJ, she never received any explanation in response to these requests. (R. 30).

9

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits

and supplemental security income, the claimant requested and received a hearing before an ALJ.

(R. 24). At the hearing, the claimant testified that despite Dr. Sehgal's February 11, 2011 report,

he had not worked as an escort driver since before August 2009. (R. 42). He also testified that he

did not ask Dr. Sehgal to write the June 12, 2010 letter—which stated that it was okay for him to

take medication and work—and that he did not know why Dr. Sehgal wrote the letter. Claimant

stated that he was unable to work because he "messed up [his] lower back" in a car wreck that

occurred around 2002. He also testified that he fell off of a porch and broke his ankle and his leg

in September of 2010, which required surgery and for him to wear a cast until December 23,

2011 and a walking cast for eight weeks after that. (R. 42-43).

Claimant testified that he lives with his mother, father, and daughter and that he cares for

his daughter as much as he is able. He stated that he can change his daughter's diaper if she

retrieves the diaper and climbs up on to the couch or if his mother brings his daughter to him.

Claimant described his typical day as beginning with him taking fifteen to twenty-five minutes to

get out of bed, followed by him using the restroom and brushing his teeth, then sitting on the

couch and watching television. He testified that he is unable to do any household chores because

of his constant pain. Claimant rated his pain as a "10" (on a scale of 1-10, with 10 being "you go

to the emergency room") if he is not taking his medicine, as a "7" if he is taking certain

medications, and as a "4" or "5" if he is taking oxycodone. (R. 48-49).

Claimant testified that his medication sometimes makes him drowsy, which requires him

to sit or lay down, and that sometimes his feet swell, which requires him to prop them up. He

testified that sometimes his legs go numb, requiring him to stand up to resume circulation, and that his hands sometimes swell "[a] little, not that bad." Claimant stated that he would probably not be able to pick up a paper clip off the table using just his fingers, but that he could likely pick it up with his fingernails. Finally, claimant testified that he had an accident in September 2010 in which he was walking around on a porch, his legs went numb, and he fell. He testified that he is unable to play any sports and that he does not remember the last time he went to a supermarket. (R. 50-52).

Claimant's brother, Jimmy Dale England, testified that he and his brother both visited Dr. Sehgal on the same days to save gas. When asked about Dr. Sehgal's July 2010 note authorizing claimant to work and the February 2011 report that claimant had back stiffness as a result of escorting mobile homes, Mr. Dale England testified that he ran the escort trip and that the doctor's office may have gotten him confused with his brother. He also testified that he has worked on his father's and his uncle's horse pen, and that the claimant had never done any of that type work. (R. 53-54). Upon further questioning, however, he later testified that he was not helping to tack something on the horse pen because his "brother and nephew does that." (R. 56).

As to his own health, Mr. Dale England testified that he was six foot, seven inches tall, weighed 231 pounds, was on medication for back problems, and was unable to fully lift his right arm because of shoulder surgery in 2005 or 2006. ( R. 55-57). At this point, the ALJ commented that Mr. Dale England's testimony "really calls into question all of this doctor's medical records," and asserted that she would write the doctor for an explanation. (R. 57-58).

Daniel Myers, the vocational expert, described claimant's past relevant work experience and then testified as to the capabilities of various hypothetical workers that the ALJ posed to him.

(R. 59-64). The ALJ described the first hypothetical individual, Mr. Alpha, as having the education, training, and work experience of the claimant, being "limited to a maximum of a light range of work," and being "limited to only occasional postural maneuvers such as balancing, stooping, kneeling, crouching, crawling, climbing ramps and stairs." Hypothetical Mr. Alpha also must "avoid overhead reaching with the right upper extremity, avoid concentrated hot and cold temperature extremes, vibration, and avoid unprotected heights and dangerous machinery." Mr. Myers testified that such an individual would be unable to perform any of the claimant's past relevant work, but would be able to be an office helper or a room service clerk. (R. 60-61).

The ALJ then described the second hypothetical individual, Mr. Beta, as having the same limitations as Mr. Alpha, but also being "limited to a maximum of sedentary range of work." Mr. Myers testified that an individual such as Mr. Beta would be able to be a foundation maker, an addresser, or a charge account clerk. The ALJ described the third hypothetical individual, Mr. Charlie, as having the same limitations as Mr. Beta but "he must also be afforded the option to sit or stand during the work day or in other words, change positions one or two minutes every hour or so." Mr. Myers testified that an individual such as Mr. Charlie would be able to work in the same positions as Mr. Beta. (R. 61-63).

The ALJ described a fourth and final hypothetical individual, Mr. Delta, as having the same limitations as Mr. Charlie, but being further "limited to occupations which could be performed by using a cane or crutch for ambulation." Mr. Myers testified that an individual such as Mr. Delta would be able to work in the same positions as Mr. Beta and Mr. Charlie.

The hearing concluded with claimant's attorney, Fern Singer, asking Mr. Myers if "by virtue of the medicine that Mr. England takes it makes him drowsy and he needs to lie down

during the day could he perform any of the jobs that you have just testified to?" Mr. Myers

answered that all of the jobs he had described would be eliminated. (R. 63-64).

*The ALJ's Decision*

On August 5, 2011, the ALJ issued a decision finding the claimant was not disabled

under the Social Security Act. (R. 24). First, the ALJ found that the claimant met the insured

status requirements of the Social Security Act through December 31, 2012.  Second, the ALJ

found that the claimant had not engaged in substantial gainful activity since the alleged onset of

his disability, although she noted that due to the confusion about the February 2011 note from the

treating physician about claimant escorting mobile homes to Louisiana, "[t]here is no way to tell

whether this was substantial gainful activity." (R. 26).

Third, the ALJ found that the claimant had the following severe impairments: "lumbar

spine spondylosis with left leg radiculitis; and neuropathy and deformity of the left toes, status

post claw toe surgery; and residuals, status post-right shoulder surgery." She found that the

claimant did not have severe impairments as to his diagnoses for anxiety and hypertension or as

to his right lower extremity. (R. 26-27). She supported these findings by looking at the claimant's

testimony regarding his fall off the porch and the lack of medical substantiation for the incident;

the records surrounding claimant's August 5, 2009 surgery on his foot; the records surrounding

claimant's March 2010 equestrian accident; the reports of Dr. Smith and Dr. Sehgal regarding

claimant's back problems; and the report of the consultative medical examiner, Dr. Vakharia. (R.

27-28).

Next, the ALJ found that the claimant does not have an impairment or combination of

impairments that meets or medically equals one of the listed impairments in the Code of Federal

Regulations. (R. 28). The ALJ then determined the claimant's residual functional capacity:

> He is limited to a maximum of a light range of work as that term is defined under the Regulations. He is further limited to only occasional postural maneuvers such as balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs. He must avoid overhead reaching with the right upper extremity. He must avoid concentrated hot and cold temperature extremes; vibration; unprotected heights; and dangerous machinery.

(R. 28-29).  In reaching this decision, the ALJ used a two-step process in which she first determined whether he had an underlying impairment and second evaluated the intensity and limiting effects of the claimant's symptoms. She summarized claimant's own testimony about the pain in his back, right shoulder, and left foot and mentioned that, "[a]ccording to the consultative medical examiner, the claimant described the pain as 'sharp' and 'as constant, moderate in intensity, at times severe.'" (R. 29).

The ALJ concluded that although some of claimant's impairments could reasonably be expected to cause some of the alleged symptoms, "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." The ALJ reached this conclusion because of her determination that the "medical records fail to document a sufficient basis to accept the claimant's allegations resulting in functional limitations as wholly credible." In support, she cited (1) claimant's testimony regarding his activities of daily living and helping to care for his young daughter, (2) her rejection of the opinion of Dr. Sehgal due to the inconsistencies and unexplained irregularities in his records, (3) claimant's receipt of unemployment compensation benefits, and (4) claimant's Adult Function Report, which shows that claimant "watches television; plays video games; changes, feeds, and rocks his daughter; shops; does dishes; and attends church." (R. 29-31).

14

Regarding her rejection of Dr. Sehgal's opinion, the ALJ acknowledged that Social Security Ruling 96-2 requires controlling weight to be given to the opinion of a treating physician. She found, however, that "even Dr. Sehgal's more specific statements concerning the claimant's functional limitations are not consistent with the substantial medical evidence of record." Specifically, she noted the following conflicts: (1) Dr. Sehgal listed many debilitating limitations in his May 27, 2010 Physical Capacities Evaluation; however a little more than a month later, in a July 12, 2010 letter, Dr. Sehgal indicated that the claimant was capable of work; and (2) on February 11, 2011, Dr. Sehgal noted that claimant reported having a stiff back because of his work escorting mobile homes to Louisiana; however, claimant and his brother claim that this note was a mistake and the note was actually referring to a complaint made by the brother. The ALJ sent interrogatories to Dr. Sehgal in an attempt to resolve these conflicts, but noted that "[n]o explanation has been received from the doctor concerning these irregularities despite the repeated request for information." (R. 30).

Regarding claimant's receipt of unemployment compensation benefits, the ALJ noted that she could not deny disability "merely because the claimant has received unemployment compensation." However, she considered it as a factor in weighing claimant's credibility because, to receive the unemployment benefits, claimant had to certify that he was "physically and mentally able to perform work of a character which he is qualified to perform by past experience or training, and he is available for such work . . . ." (R. 30-31).

Continuing on, the ALJ adopted the opinion of the vocational expert and found that the claimant was unable to perform any past relevant work. She then found that the claimant met the definition for a "younger individual," that he had limited education and was able to communicate

15

in English, and that the transferability of his job skills was not material because the claimant could be found "not disabled" regardless. The ALJ then determined that, "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, jobs exist in significant numbers in the national economy that he can perform." (R. 31-32).

To support this finding, the ALJ looked to the Medical-Vocational Guidelines, as well as the opinion of the vocational expert. She referred back to the hearing where she had asked the vocational expert about jobs existing in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. She found that the vocational expert's recommended occupations, such as office helper, room service clerk, and checker, were consistent with the Dictionary of Occupational Titles and that "the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." As a result of this determination, the ALJ made her final conclusion, finding that "[t]he claimant has not been under a disability, as defined in the Social Security Act, from October 30, 2008, through the date of this decision." (R. 31-32).

## VI. DISCUSSION

A. Application of the Pain Standard

The claimant argues that "the ALJ makes absolutely no finding as to the Plaintiff's pain and it's (sic) effect on his ability to work . . . [and] never mentions the 11th Circuit Pain Standard." (Doc. 7, at 9).

The court disagrees. The Eleventh Circuit has established a standard that an ALJ must use in evaluating pain and other subjective symptoms. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). The pain standard requires "evidence of an underlying medical condition" and either

16

"objective medical evidence that confirms the severity of the alleged pain arising from that condition" or "that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain." *Id*.

An ALJ does not have to specifically recite the language of the test, as long as her "findings and discussion indicate that the standard was applied." *Wilson v. Barnhart*, 284 F.3d 1219, 1225-26 (11th Cir. 2002). Furthermore, as the claimant points out in his brief, "[i]n determining whether the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain, the fact-finder must also consider the credibility of claimant's testimony." *Lamb v. Bowen*, 847 F.2d 698, 702 (11th Cir. 1988); *see also* (Doc. 7, at 10).

In this case, the ALJ may not have used the "pain standard" label, but she did explicitly apply a "two-step process." (R. 29). Her explanation of step one of this process directly tracks the Eleventh Circuit's articulation of the pain standard. *Lamb v. Bowen*, 847 F.2d at 702; *see also Holt*, 921 F.2d at 1223. After explaining her process of analysis, the ALJ found as follows:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity.

(R. 29). Although the ALJ did not use the word "pain" in this statement, but instead referred to the claimant's "symptoms," given the context of the surrounding discussion of claimant's pain, she clearly intended pain to be included in these "symptoms." Therefore, the discussion itself reveals that the ALJ applied the pain standard.

Furthermore, in applying this standard to determine the claimant's residual functional

17

capacity, the ALJ conducted a detailed analysis of various pieces of evidence and thoroughly explained why she reached the conclusion that claimant's pain did not limit him to the extent he claimed. The ALJ addressed the opinions of various doctors, as will be discussed in further detail in Sections B and C, below. She considered the credibility of the claimant's testimony, as was required by the Court in *Lamb*, discussing how his claim of disability was inconsistent with his testimony regarding his daily activities, his own assertions on his Adult Function Report, and his receipt of unemployment benefits. *See Lamb*, 847 F.2d at 702. Although the ALJ acknowledged that claimant's receipt of unemployment benefits was not conclusive proof that he was not entitled to disability benefits, she permissibly incorporated it as one of several factors that contributed to her determination regarding claimant's credibility. Based on the explicit findings of the ALJ, this court concludes that she properly applied the Eleventh Circuit's pain standard.

## B. Weight to the Opinions of the Treating Physician

The claimant also argues that the ALJ improperly rejected the opinion of Dr. Sehgal, claimant's treating physician.

"[A]bsent a showing of good cause to the contrary" an ALJ must accord the opinion of a treating physician "substantial or considerable weight." *Lamb*, 847 F.2d at 703. The Eleventh Circuit has found that "good cause" exists when: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). Furthermore, when choosing to disregard a treating physician's opinion, an ALJ must clearly articulate her reasons for doing so. *Id*.

18

In this case, the ALJ acknowledged her duty to give controlling weight to Dr. Sehgal's opinion in most circumstances and laid out her reasons for refusing to accord substantial weight to his opinion. She explicitly stated that Dr. Sehgal's conclusions were "not consistent with the substantial medical evidence of record," (R. 30), dropping her opinion squarely within the third circumstance in which an ALJ may reject the opinion of a treating physician for good cause. *See Phillips*, 357 F.3d at 1240-41.

This court finds that the ALJ presented substantial evidence to support her conclusion that Dr. Sehgal's opinion as to claimant's functional limitations were not supported by the doctor's own medical records. Dr. Sehgal's medical records include a July 12, 2010 letter that explicitly authorized the claimant to work, in spite of his "daily medication for pain and nerves." (R. 325). In addition, Dr. Sehgal's notes refer to the claimant performing work on various occasions; on June 24, 2010 Dr. Sehgal referred to claimant's work in a horse pen and on February 11, 2011, Dr. Sehgal noted that claimant's back was stiff because of his work escorting mobile homes to Louisiana. Although claimant and his brother testified that these notes were mistaken and actually refer to claimant's brother, Dr. Sehgal himself never provided any explanation, despite the repeated attempts of the ALJ to procure one. No matter the explanation, these medical records do not substantiate Dr. Sehgal's ultimate conclusion that the claimant cannot work. Either Dr. Sehgal and his staff have repeatedly made inaccurate entries in claimant's medical record, calling the record into question in its entirety, or claimant has been working at least intermittently during his period of claimed disability, which directly contradicts Dr. Sehgal's conclusion and claimant's testimony.

Furthermore, good cause to reject Dr. Sehgal's opinion also exists under the Eleventh

19

Circuit's first and second circumstances, as Dr. Sehgal's opinion was not supported by the other

evidence and was, in fact, contradicted by it. *See Phillips*, 357 F.3d at 1240-41. Claimant testified

at the hearing that he provided some care for his young daughter, such as changing her diaper

when she brings it to him. Additionally, claimant himself noted in his Adult Function report that

he is capable of showering; changing, feeding, bathing, and rocking his daughter; putting her

down for naps; helping pick up dishes and dirty clothes; going to the store two to three times a

week; and playing video games. Finally, claimant certified on his application for unemployment

compensation benefits that he is "physically and mentally able to perform work." This other

evidence outside the medical record also fails to support, and actually contradicts, Dr. Sehgal's

findings. Therefore, for all of these reasons, this court finds that the ALJ properly rejected the

opinion of Dr. Sehgal and provided a sufficient explanation of her good cause for doing so.

C. Weight to the Opinions of the Consultative Medical Examiner

In his final argument, claimant asserts that the ALJ ignored the consultative evaluation

report of Dr. Vakharia and failed to specify any weight given to his opinion. An ALJ must clearly

state the weight accorded to the various testimony considered in her decision. *Cowart v.*

*Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). She does not, however, have any obligation to

give particular weight to the opinion of an examining physician, or, in other words, any non-

treating physician. *See Hankins v. Astrue*, No. 4:11-cv-2426-RDP, 2012 WL 4479242, at *8

(N.D. Ala. September 24, 2012) (citing *Russell v. Astrue*, 331 F. Appx. 678, 681-82 (11th Cir.

2009)).

Furthermore, a failure to articulate the weight given to a physician's opinion may be

harmless if the opinion does not contradict the ALJ's findings. *See Wright v. Barnhart*, 153 F.

Appx. 678, 684 (11th Cir. 2005) ("Although the ALJ did not explicitly state what weight he afforded the opinions of [several physicians], none of their opinions directly contradicted the ALJ's findings, and, therefore, any error regarding their opinions is harmless."). In *Wright*, the Court specifically stated that, "while each of these doctors found that [claimant] suffered from chronic pain or conditions associated with chronic pain, not one of these doctors indicated that [claimant] is unable to perform sedentary work as a result of that pain." *Id*.

Claimant is incorrect in his assertion that the ALJ ignored the report of Dr. Vakharia; although the ALJ did not discuss Dr. Vakharia by name, she referred multiple times to the "consultative medical examiner" and then cited exhibits that confirm that this individual is Dr. Vakharia. The ALJ did, however, fail to explain the weight she accorded to this particular medical opinion. Under the law of the Eleventh Circuit, this failure is error and this court must decide whether that error is harmless error or whether it constitutes grounds for reversal.

Dr. Vakharia did indeed find that claimant suffers from "[m]oderate to [s]evere low back pain" and a variety of other ailments, but he did not make a recommendation as to claimant's ability to work. The ALJ's findings of claimant's severe impairments were entirely consistent with Dr. Vakharia's report. Furthermore, the ALJ acknowledged that claimant's impairments could reasonably be expected to cause some of the alleged symptoms, a.k.a., pain, and merely questioned claimant's claims as to the intensity and limiting effects of those symptoms.

This situation is quite similar to that addressed by the Eleventh Circuit in *Wright*; in that case, the ALJ properly rejected the opinions of the treating physicians because their conclusions were inconsistent with their own findings, but failed to state the weight he afforded the opinions of the other doctors.  *Wright*, 153 F. Appx. at 684. There, as here, the other physicians had found

that the claimant experienced chronic pain, but had not indicated that the pain prevented the claimant from performing sedentary work. *Id*.

Given the factual similarity of these two cases, this court adopts the posture of the Eleventh Circuit in *Wright* and finds that the ALJ's failure to accord a specific weight to Dr. Vakharia's opinion is harmless error, as Dr. Vakharia's opinion did not contradict the findings of the ALJ.

## VII. CONCLUSION

The court finds that the ALJ's factual conclusions are supported by substantial evidence and that she applied the correct legal standards in all matters except in her failure to state the weight she accorded to the consultative medical examiner. The court finds this error to be harmless. Therefore, for these reasons, this court concludes that the decision of the ALJ is to be AFFIRMED.

DONE and ORDERED this 17th day of September, 2013.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE